UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------------x
Neemah Pam Fisher, Nathan Pam, Raziel Pam, Ephriam    :
Bluth, individually and as the Legal Representative    :
of Shoshana Bluth, Tsipora Batya Bluth Reicher, Isaac  :  **COMPLAINT**
Menachem Bluth, Yigal Amichai Bluth, Aryeh Yehuda   :
Bluth, Chanina Samuel Bluth, Abraham Aharon Bluth  :
and Joseph Shimshon Bluth,    :  **NO.**  18-CV-7463
    :
             Plaintiffs,    :
    :
        -against-    :
    :
CRÉDIT LYONNAIS, S.A. and LCL, S.A., as successor  :
in interest to CRÉDIT LYONNAIS, S.A.,    :
    :
          Defendants.    :
    :
-------------------------------------------------------------------------------x

       The Plaintiffs in this action ("Plaintiffs"), by their attorneys, hereby allege the following

upon information and belief.  The Plaintiffs include: Neemah Pam Fisher, Nathan Pam and Raziel

Pam (collectively the "Pam Plaintiffs"); and Ephriam Bluth, individually and as the Legal

Representative of Shoshana Bluth, Tsipora Batya Bluth Reicher, Isaac Menachem Bluth, Yigal

Amichai Bluth, Aryeh Yehuda Bluth, Chanina Samuel Bluth, Abraham Aharon Bluth and Joseph

Shimshon Bluth (collectively the "Bluth Plaintiffs").

## NATURE OF THE ACTION

       1.      This is a complaint for damages arising out of the conduct of defendant Crédit

Lyonnais, S.A., which, together with its successor in interest and/or d/b/a LCL, S.A., is referred to

herein as "Crédit Lyonnais" or "Defendants."

       2.      This action is related to the action pending in this Court before the Hon. Dora L.

Irizarry captioned *Wolf, et al. v. Credit Lyonnais, S.A.,* Civil Action No. 1:07-cv-914. Plaintiffs in

the *Wolf* action seek damages against defendant Crédit Lyonnais, S.A. as a result of Crédit Lyonnais' knowing provision of financial services to the foreign terrorist organization HAMAS. By engaging in that misconduct, Crédit Lyonnais' aided and abetted the commission of acts of international terrorism, including the terror attacks that injured the *Wolf* plaintiffs.

3.       All of the claims at issue in this action relate to the same terror attacks that are before the Court in the *Wolf* action, and all of the Plaintiffs in this action are family members of existing plaintiffs in *Wolf*.

4.       In bringing this action, Plaintiffs rely upon the *Wolf* Court's prior decision that it may exercise specific personal jurisdiction over Crédit Lyonnais in connection with the attacks at issue as a result of its contacts with New York and with the United States.[1]

5.       In addition, in this Complaint, Plaintiffs have deliberately adhered to the allegations in the operative Amended Complaint in *Wolf*, and have not added allegations from the existing summary judgment record in the case or cited to additional evidence gained in discovery. Nor are Plaintiffs asserting any claims than the *Wolf* plaintiffs have not alleged; rather, Plaintiffs have conformed their claims to the operative causes of action set forth in the parties' joint pretrial order in *Wolf* and in the *Wolf* plaintiffs' opposition to Crédit Lyonnais's motion for summary judgment.

6.       Crédit Lyonnais, S.A. was a financial institution incorporated and headquartered in France that knowingly provided financial services and collected and transmitted money for the benefit of HAMAS,[2] a Foreign Terrorist Organization ("FTO") (as that term is defined in 8 U.S.C. § 1189 of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")).

---

[1]  The Court's decision is attached as Exhibit A to the Complaint and is incorporated herein by reference pursuant to Fed. R. Civ. P. 10(c).

[2] HAMAS is an acronym for "Harakat al-Muqawama al-Islamiyya" also known as the "Islamic Resistance Movement."

7. By engaging in that misconduct, Crédit Lyonnais substantially assisted in the commission of acts of international terrorism, as defined by 18 U.S.C. § 2331.

8. In addition, Crédit Lyonnais aided and abetted the commission of acts of international terrorism that injured Plaintiffs and violated the criminal prohibitions on providing material support for acts of international terrorism set forth in the Antiterrorism Act ("ATA"), as amended by the AEDPA (*see, e.g.*, 18 U.S.C. §§ 2339B and 2339C).

9. Credit Lyonnais is therefore civilly liable under §2333(a) of the ATA to Plaintiffs, who have been injured in their person and property by reason of acts of international terrorism perpetrated by HAMAS.

## JURISDICTION AND VENUE

10. This case is a civil action brought by citizens of the United States, their estates, survivors, and heirs. Plaintiffs have been killed or injured by reason of acts of international terrorism. As a result, this Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. §§ 2333 and 2334.

11. Venue is proper in this district pursuant to 18 U.S.C. § 2334(a) and 28 U.S.C. §§ 1391(c)(3) and (d).

12. Crédit Lyonnais is subject to personal jurisdiction in this Court for all of the reasons identified by the *Wolf* court in Exhibit A hereto. Crédit Lyonnais is subject to personal jurisdiction in the United States pursuant to Fed. R. Civ. P. 4(k) because, among other things, it continuously and systematically does business in the United States. Crédit Lyonnais is also subject to personal jurisdiction in the United States pursuant to 18 U.S.C. § 2339B(d)(1)(D) because it has committed tortious acts within the United States by transferring funds through the United States for the benefit

of HAMAS, and has purposefully availed itself of United States jurisdiction in the course of committing the wrongful acts alleged herein.

13.     Credit Lyonnais is also subject to personal jurisdiction under CPLR 302 because, among other reasons: (a) it transacted business within New York and contracted to supply services within New York; (b) it committed tortious acts within New York; and (c) it committed tortious acts outside of New York that caused injury within New York and (i) it regularly does and solicits business, engages in other persistent conduct, and derives substantial revenue from services rendered in New York and (ii) it expected or should reasonably have expected its conduct to have consequences within New York and it derives substantial revenue from  interstate and international commerce.

## THE PARTIES

### A.     The Plaintiffs

**Pam Plaintiffs**

14.     On June 11, 2003, 16-year-old Rivka Reena Pam was on Bus No. 14A in Jerusalem, Israel.  Around 5:30 p.m., an individual dressed as an ultra-orthodox Jew boarded Egged Bus No. 14A at the Mahane Yehuda market.  A short while later, as the bus drove down Jaffa Road, within Jerusalem, Israel, the terrorist detonated his bomb, wrecking the bus and killing sixteen passengers. Over 100 people were wounded, including dozens of passersby.

15.     HAMAS claimed responsibility for the bombing.  The suicide bomber who acted for HAMAS to commit this brutal attack was Abed Al Mo'ti Mohammad Shabana.  He carried a huge bomb containing a great deal of metal fragments that caused massive injuries.

16.     This terror attack was within the scope of the scheme and conspiracy described below in which Credit Lyonnais was a knowing and active participant.

17.     Rivka works with children and this teenager's life has changed dramatically as a result of her injuries in this terrorist incident.  She was hospitalized for a number of days in intensive care, suffered burns, lung damage, eye injury, scarring and severe hearing loss, which requires future medical and surgical care.  Her happy outgoing personality has been affected because of the severe emotional distress, hearing loss, pain, suffering, mental anguish, and trauma that she has experienced from this terrorist attack, all to her damage.

18.     Rivka Reena Pam is a plaintiff in *Wolf, et al. v. Credit Lyonnais, S.A.,* Civil Action No. 1:07-cv-914-DLI-RML.

19.     Plaintiff Neemah Pam Fisher is a citizen of the United States and a resident of the State of Israel.  She is the sister of Rivka Reena Pam.  As a result of the attack upon her sister, Rivka, Neemah Pam Fisher has suffered severe mental anguish and extreme emotional pain and suffering.

20.     Plaintiff Natan Pam is a citizen of the United States and resident of California.  He is the brother of Rivka Reena Pam.  As a result of the attack upon his sister, Rivka, Nathan Pam has suffered severe mental anguish and extreme emotional pain and suffering.

21.     Plaintiff Raziel Pam is a citizen of the United States and resident of California.  He is the brother of Rivka Reena Pam.  As a result of the attack upon his sister, Rivka, Raziel Pam has suffered severe mental anguish and extreme emotional pain and suffering.

**Bluth Plaintiffs**

22.     Nethaniel Bluth is a citizen of the United States who for some time has resided in Israel with his parents, Ephraim and Shoshana.  On March 7, 2002, Nethaniel was a 19-year-old student at Otzem, a school located in the community of Atzmona, Israel.  Nethaniel began his studies there in August, 2001.

23.     On March 7, 2002, while Nethaniel was studying with about 80 other students in a lesson being led by a rabbi, a small explosion occurred.  Nethaniel and the other students rushed to the window to see what had happened.  A Palestinian terrorist who was in the midst of attacking the students had thrown a grenade into one of the dorm rooms.

24.     It was late at night, around 11:00 p.m., and the students looked in horror as the terrorist opened fire on them with a burst from an automatic weapon.  The attacker threw additional grenades in an attempt to kill and injure as many of the students as possible.  Nethaniel was struck by shrapnel when a grenade exploded only a few feet from him.  His arms, legs and scalp were injured.  One piece of shrapnel pierced his chest and hit his chest bone.  He suffered pain, trauma, mental anguish and extreme emotional distress, all to his damage.

25.     HAMAS claimed responsibility for the attack, which was committed by Mohammed Fathi Farahat, a/k/a Mohammed Nadal Farhath, a HAMAS agent.

26.     This terror attack was within the scope of the scheme and conspiracy described below in which Credit Lyonnais was a knowing and active participant.

27.     Nethaniel was rushed to Tel HaShomer Hospital for surgery to save his life.  Five of his classmates were murdered in the attack.

28.     Nethaniel underwent three surgical procedures following the attack.  His chest wound was closed, a gash in his scalp was surgically treated and the various wounds to his arms were stitched.  Nethaniel has scars from these injuries.

29.     After rehabilitation, Nethaniel regained most of the use of his hands, arms and legs. He also suffered severe damage to both of his ear drums when the grenade exploded close to him. His hearing is permanently impaired in his left ear.

30.     Nethaniel Bluth is a plaintiff in *Wolf, et al. v. Credit Lyonnais, S.A.*, Civil Action No. 1:07-cv-914-DLI-RML.

31.     Plaintiff Ephriam Bluth is a citizen of the United States and a resident of the State of Israel.  He is the father of Nethaniel Bluth.  As a result of the attack upon his son, Nethaniel, Ephriam Bluth has suffered severe mental anguish and extreme emotional pain and suffering.

32.     Plaintiff Ephriam Bluth is the sole legal heir of Shoshana Bluth.  Shoshana Bluth was the mother of Nethaniel Bluth.  As a result of the attack upon her son, Nethaniel, Shoshana Bluth suffered severe mental anguish and extreme emotional pain and suffering prior to her death.

33.     Plaintiff Tsipora Batya Bluth Reicher is a citizen of the United States and a resident of the State of Israel.  She is the sister of Nethaniel Bluth.  As a result of the attack upon her brother, Nethaniel, Tsipora Batya Bluth Reicher has suffered severe mental anguish and extreme emotional pain and suffering.

34.     Plaintiff Isaac Menachem Bluth is a citizen of the United States and a resident of the State of Israel.  He is the brother of Nethaniel Bluth.  As a result of the attack upon his brother, Nethaniel, Isaac Menachem Bluth has suffered severe mental anguish and extreme emotional pain and suffering.

35.     Plaintiff Yigal Amichai Bluth is a citizen of the United States and a resident of the State of Israel.  He is the brother of Nethaniel Bluth.  As a result of the attack upon his brother, Nethaniel, Yigal Amichai Bluth has suffered severe mental anguish and extreme emotional pain and suffering.

36.     Plaintiff Aryeh Yehuda Bluth is a citizen of the United States and a resident of the State of Israel.  He is the brother of Nethaniel Bluth.  As a result of the attack upon his brother,

Nethaniel, Aryeh Yehuda Bluth has suffered severe mental anguish and extreme emotional pain and suffering.

37.     Plaintiff Chanina Samuel Bluth is a citizen of the United States and a resident of the State of Israel.  He is the brother of Nethaniel Bluth.  As a result of the attack upon his brother Nethaniel, Chanina Samuel Bluth has suffered severe mental anguish and extreme emotional pain and suffering.

38.     Plaintiff Abraham Aharon Bluth is a citizen of the United States and a resident of the State of Israel.  He is the brother of Nethaniel Bluth.  As a result of the attack upon his brother, Nethaniel, Abraham Aharon Bluth has suffered severe mental anguish and extreme emotional pain and suffering.

39.     Plaintiff Joseph Shimshon Bluth is a citizen of the United States and a resident of the State of Israel.  He is the brother of Nethaniel Bluth.  As a result of the attack upon his brother, Nethaniel, Joseph Shimshon Bluth has suffered severe mental anguish and extreme emotional pain and suffering.

**B.    The Defendants**

40.     Crédit Lyonnais, S.A. was founded in 1863 in Lyons, France.  In 2003, it was acquired by Crédit Agricole, another French bank.  It now operates under the name LCL S.A., as a subsidiary of the Crédit Agricole Group.

41.     Crédit Lyonnais maintains its principal place of business in Paris, France.

42.     Crédit Agricole Group conducts business in the United States and maintains an office at 1301 Avenue of the Americas, New York, New York.

43.     Crédit Lyonnais can sue and be sued in the United States.

## FACTUAL ALLEGATIONS

**A.** **The Islamic Resistance Movement ("HAMAS")**

**1.** **The Founding of HAMAS**

44.     In December 1987, Sheik Ahmed Yassin formed the Palestinian Islamic Resistance Movement ("HAMAS") as an offshoot of the Muslim Brotherhood, a radical Islamic group founded in Egypt before World War II.

45.     Pursuant to its charter, HAMAS and its operatives plan, assist, and conduct acts of international terrorism in Israel and the Gaza Strip, including the attacks that injured the Plaintiffs.

**2.** **Formal Designations of HAMAS as a Terrorist Organization**

46.     In 1989, the Government of Israel declared HAMAS a terrorist organization and also declared it an "unlawful organization" because of its terrorist acts.  Notice of the designation was placed in an official Government of Israel publication, the Announcements and Advertisements Gazette.

47.     Initially, HAMAS specialized in kidnapping and executing people suspected of cooperating with Israel.  It quickly evolved and broadened its operations so that, by the early 1990's, it specialized primarily in murdering civilians in Israel.

48.     For example, on April 6, 1994, a HAMAS suicide bomber blew up a bus in Afula, killing eight (8) people.

49.     On April 13, 1994, a HAMAS suicide bomber blew up a bus in Hadera, killing five (5) people.

50.     On October 19, 1994, a HAMAS suicide bomber blew up a bus in Tel Aviv, killing twenty-two (22) people.

51.     On January 23, 1995, President Clinton issued Executive Order 12947.  President Clinton found that "grave acts of violence committed by foreign terrorists that threaten to disrupt the Middle East peace process constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States."

52.     Executive Order 12947 designated HAMAS a Specially Designated Terrorist ("SDT").  The Executive Order also blocked all property and interests in property held by the terrorist organizations and persons designated in the Order, including HAMAS.

53.     On February 25, 1996, a HAMAS suicide bomber blew up a bus in Jerusalem, killing twenty–six (26) people, three (3) of whom were U.S. citizens, and injuring eighty (80) people, three (3) of whom were U.S. citizens.  HAMAS claimed responsibility for the bombing.

54.     On October 8, 1997, by publication in the Federal Register, the United States Secretary of State designated HAMAS a Foreign Terrorist Organization ("FTO") pursuant to Section 219 of the Immigration and Nationality Act and the AEDPA.  This designation has been renewed every two years since 1997.

55.     After the September 11, 2001 terrorist attacks on the United States, President Bush issued Executive Order 13224, declaring a national emergency with respect to the "grave acts of terrorism … and the continuing and immediate threat of further attacks on United States nationals or the United States."  Executive Order 13224 designated HAMAS a Specially Designated Global Terrorist ("SDGT").  The Executive Order also blocked all property and interests in property held by the designated SDGTs, including HAMAS.

### 3.  HAMAS's Organizational Structure and Fundraising Network

56.     HAMAS's terrorist operations depend upon its religious and social activities to recruit, educate and train terrorists and to collect material and aid.  Its terrorist operations and social activities operate side-by-side and support each other.

#### a.  The "Dawa"

57.     HAMAS's infrastructure in the Palestinian Authority-controlled territory ("the PACT") is comprised of two interwoven components: its terrorist apparatus and its religious and social infrastructure, which is responsible for recruiting and training terrorists.  This patchwork of charitable and social institutions is commonly referred to by HAMAS as the "Dawa."

58.     For the purpose of raising funds for its operations, HAMAS has established "charity" committees across the PACT and abroad, including committees in Ramallah, Jenin, and Tulkarem that are controlled by HAMAS agents and that collect and distribute their funds on behalf of HAMAS.[3]

59.     At all relevant times, Credit Lyonnais was (and is) generally aware of HAMAS's structure and the connection between HAMAS and its "charity" committees.

60.     The charity associations and committees channel funds to pay expenses and assist families of terrorist operatives who are arrested, injured or killed.

61.     The charity associations also provide housing subsidies to the families of suicide bombers whose homes are often demolished by the Israeli army after the bomber's identity has been confirmed.

---

[3] There are approximately 80 such "charitable" committees in the West Bank and Gaza Strip. Those entities are nominally supervised by the Palestinian Authority's Ministry of Waqf and Religious Affairs.

62.     These "charities" and other supposed "charitable" associations not only help raise funds for HAMAS's terrorist operations, but also help it identify and recruit potential terrorists. The network of supposed charities assists recruitment, in part, by funneling money to pay benefits to the families of terrorist operatives who are arrested, injured or killed.

63.     HAMAS, like other foreign terrorist organizations, collects funds under the guise of political or humanitarian activities.  This fundraising ultimately supports the kind of terrorist activities that injured the Plaintiffs herein.

### b.  HAMAS's Terrorism Financing

64.     Funds raised by or on behalf of HAMAS for "charitable purposes" are used to finance its terrorist activities.  As Congress found when passing the AEDPA: "Foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct."  Antiterrorism Act of 1996, Pub. L. No. 104-132, § 301(a)(7), 110 Stat. 1247.

65.     HAMAS receives a majority of its financing through donations coordinated by prominent Saudi and Gulf State charities and the global network of charities known as the Union of Good, which is operated by the Muslim Brotherhood.  Comite de Bienfaisance et de Secours aux Palestinians, a/k/a Comite Bienfaisance pour la Solidarite avec la Palestine ("CBSP"), is a member of the Union of Good and is one of its most significant fundraising arms.

### c.  The Union of Good

66.     I'Tilafu Al-Khayr, a/k/a the Union of Good, is an umbrella organization established by the Muslim Brotherhood in October 2000, immediately following the outbreak of the violent Palestinian terrorist uprising commonly termed the "Second Intifada."

67.     The Union of Good is a principle fundraising mechanism for HAMAS.  The Union of Good's primary "charitable" purpose is to provide financial support for HAMAS and its agents in the PACT.

68.     The Union of Good is comprised of more than fifty (50) Islamic charitable foundations worldwide.  The U.S. government has designated several of these foundations, including CBSP, as SDGTs.

69.     For example, the Union of Good's "101 Days Campaign" once maintained its own website at www.101days.org.  That "campaign" solicited funds for HAMAS and directed prospective donors to donate via various Union of Good charities, including CBSP, which maintained a link to www.101days.org on its own website.

70.     The 101 Days Campaign website did not identify Credit Lyonnais as the bank used by CBSP to collect donations.

71.     During periods relevant to this action, the board of directors of the Union of Good included three senior HAMAS figures: Sheikh Hamid al-Bitawi; Dr. Essam Salhoub; and Bassam Jarrar.

72.     The Union of Good is headed by Dr. Yussuf al-Qaradawi, an extremist Sunni Muslim scholar based in Qatar, whose views and activities have been a matter of public record for many years.[4]

73.     Through his many public appearances and his popular television program, al-Qaradawi has broadcast his views about the moral rectitude of murdering Jews and Israelis.

---

[4] Al-Qaradawi was the subject of massive publicity in Great Britain when he was invited to London by its mayor in July 2004, but his prominence long pre-dated that event.

74.     To take just one example, in a September 1999 article in the Palestine Times, entitled "Sheikh Yousuf al-Qaradawi: Hamas and the Islamic Jihad Represent the Glorious Face of the Islamic Umma – Interview," al-Qaradawi blessed "the martyrdom operations in which a given Moslem fighter turns himself or herself into a human bomb that casts terror in the hearts of the enemy."  He further stated, "If we can't carry out acts of Jihad [holy war] ourselves, we at least should support and prop up the Mujahideen [holy warriors] financially and morally so that they will be steadfast until God's victory."

75.     In 2001, al-Qaradawi publicly described the activities of the Islamic charitable societies sustaining the Intifada against Israel as a "new type of jihad, financial jihad, through which financial support is guaranteed to the martyrs' families, Palestinian prisoners and detainees, and every Palestinian whose property is damaged during the conflict."

76.     Al-Qaradawi is not an obscure figure.  On the contrary, he has his own weekly television program on Al Jazeera and has publicly issued an Islamic religious edict (fatwa) authorizing suicide bombing attacks against Israel.[5]

77.     In fact, on April 14, 2002, al-Qaradawi appeared on Al Jazeera extolling "jihad and martyrdom" against Israelis and denouncing the U.S. designation of HAMAS and other terrorist organizations.

78.     Upon information and belief, throughout the time period relevant to this action, Credit Lyonnais was aware of Al-Qaradawi's support for terrorism, his connection to the Union of Good, and its relationship with Crédit Lyonnais's client, CBSP.

---

[5] Al-Qaradawi was also the first scholar who authorized women to commit suicide attacks (March 2002) in the context of the second Intifada, as cited in HAMAS's official website: http://www.palestine-info.info/arabic/fatawa/alamaliyat/qaradawi.htm.

**4.  HAMAS Carries Out Repeated Terrorist Attacks
While Credit Lyonnais Maintains Its Banking Relationship
with Le Comite de Bienfaisance et de Secours aux Palestinians**

79.     CBSP is a non-profit corporation organized in 1990, with its headquarters in France.

80.     Crédit Lyonnais has publicly stated that CBSP opened accounts with Crédit Lyonnais in 1990.

81.     CBSP was originally incorporated under the name Le Comite de Bienfaisance et de Solidarite avec la Palestine, but changed its corporate name to CBSP in 2001.

82.     CBSP has four branches in France, located in Paris, Lille, Lyon and Marseilles.

83.     CBSP is a member of the Union of Good and is part of HAMAS's fundraising infrastructure.

84.     During the time period relevant to this action, the two leading figures in CBSP were Mahmoud Hussein al-Bughani, its former chairman, and Khaled Muhammed Ahmad al-Shouli, its chairman and director.

85.     In 1997, the Government of Israel declared CBSP an "unlawful organization" because of its affiliation with HAMAS and the support it provided to HAMAS front organizations. Notice of the designation was placed in an official Government of Israel publication, the Announcements and Advertisement Gazette.

86.     CBSP was further designated a terrorist organization in January 1998 by the Government of Israel.  Notice of the designation was placed in the Announcements and Advertisement Gazette.

87.     Upon information and belief, at all relevant times after December 2000, Crédit Lyonnais knew of the Israeli designation.

88.     Crédit Lyonnais has publicly admitted that, in late 2000, it began to notice "unusual activity occurring in [CBSP's] main account."   Nevertheless, Crédit Lyonnais did not close CBSP's accounts or freeze any funds in CBSP's main account at that time.

89.     On March 28, 2001, Fadi Attallah Yusef Amer, a HAMAS-trained terrorist, blew himself up outside a gas station near Kfar Sava, killing two teenagers, and injuring Netanel Herskovitz, a plaintiff in *Wolf, et al. v. Credit Lyonnais, S.A.,* Civil Action No. 1:07-cv-914-DLI-RML.

90.     In July 2001, the French police launched an initial investigation of CBSP.

91.     On August 9, 2001, Iz Aldin Al Masri, a HAMAS suicide bomber, massacred fifteen (15) people, including seven (7) children, and injured more than one hundred (100) people when he detonated his explosives at the Sbarro's Pizzeria in downtown Jerusalem.

92.     Even after these attacks, and despite readily available public information regarding CBSP's connections to HAMAS and the Union of Good, Crédit Lyonnais continued to provide financial services to CBSP and to transfer funds to HAMAS.

93.     On December 1, 2001, scores of people were injured on or near Ben-Yehuda Street in Jerusalem during a double suicide bombing followed by a coordinated car bombing, all perpetrated by HAMAS.  These attacks killed ten (10) people and injured more than one hundred (100) people.

94.     In January 2002, the Palestinian Authority froze wire transfers from Khaled Muhammed Ahmad al-Shouli, CBSP's chairman, to the well-known HAMAS front known as Al-Mujama al-Islami because of its connections to HAMAS.  This "charity" was established by the late Sheik Yassin, who is regarded as the spiritual leader of HAMAS.

95.     According to Crédit Lyonnais, in January 2002, more than a year after it first noted "unusual activity" in CBSP's accounts, Crédit Lyonnais "began a process of closing these accounts." By its own admission, Crédit Lyonnais did not complete the "process" of closing the accounts until September 2003, almost two years after reporting the "unusual activity," and after HAMAS injured Rivka Pam and Nethanial Bluth, whose family members are plaintiffs in this action.

96.     During this time period, Crédit Lyonnais transferred funds to institutions that contributed to HAMAS's financial infrastructure in the PACT, including many entities declared unlawful by the Government of Israel. The Palestinian Authority had also publicly identified several of these entities as sources of HAMAS financing.

97.     These institutions included, but were not limited to, the Orphan Care Society of Bethlehem, Al-Islah Charitable Society in Ramallah-Al-Bireh, the Ramallah-Al-Bireh Charitable Society, the Jenin Charity Committee, the Hebron Islamic Association, the Tulkarem Charity Committee, Al-Mujama al-Islami, the Islamic Charitable Society in the Gaza Strip, the Al-Salah Society, and the Muslim Youth Association of Hebron.[6]

98.     The Orphan Care Society of Bethlehem was outlawed by the Government of Israel in February 2002. Most of its chief functionaries, including its director, Dr. Ghassan Harmass, are HAMAS terrorists. The Orphan Care Society pays subsidies to the children of HAMAS "martyrs" and imprisoned HAMAS members.

---

[6] The Jenin Charity Committee and Tulkarem Charity Committee were specifically identified as HAMAS-controlled organizations by the United States Government in the July 2004 criminal indictment of Holy Land Foundation for Relief and Development in the Northern District of Texas.

99.     The Al-Islah Charitable Society in Ramallah-Al-Bireh was founded in 1997.  The Government of Israel declared the Al-Islah Charitable Society an "unlawful organization" in February 2002.  During the time period relevant to this action, the Al-Islah Charitable Society regularly transferred money for the benefit of the families of HAMAS "martyrs" and subsidized the renovation of homes destroyed by Israel that belonged to the families of suicide bombers.  The Al-Islah Charitable Society regularly supported the families of "martyrs" and imprisoned HAMAS members.

100.     The Jenin Charity Committee was declared an "unlawful organization" by the Government of Israel in February 2002.  This "charity" is run by HAMAS terrorists, and it provides aid to HAMAS terrorists and the families of "martyrs," *i.e.*, Palestinians wounded or imprisoned as a result of violent confrontations with Israel.

101.     The Tulkarem Charity Committee was founded in 1981. The Government of Israel declared the Tulkarem Charity Committee an "unlawful organization" in February 2002.  During the time period relevant to this action, the Tulkarem Charity Committee was headed by a HAMAS terrorist.

102.     Having decided to close the relevant CBSP accounts in January 2002, Crédit Lyonnais was, upon information and belief, aware of the designation by Israel of various HAMAS fronts in February 2002, but nonetheless continued transmitting funds to them.

103.     In May 2002, the state prosecutor in Nancy, France asked the Regional Service of the Judiciary Police in France to investigate CBSP after receiving a briefing from "Tracfin" (the French government agency acronym for "Traitement du renseignment et action contre les circuits financiers clandestins" or "agency for intelligence processing and action against clandestine

financial networks").   Crédit Lyonnais was not publicly mentioned in connection with the investigation.

104.    On June 18, 2002, a HAMAS suicide bomber detonated a bomb on Egged Bus No. 32A near Gilo.  Nineteen (19) people were killed.

105.    On July 31, 2002, Mohammed Odeh detonated explosives in the Hebrew University Cafeteria, killing nine (9) people.  HAMAS was responsible for the attack.

106.    According to published reports, in 2002 alone, CBSP raised nearly $4,000,000.00, most of it after Crédit Lyonnais decided to close its accounts, but failed to actually do so.

107.    On March 5, 2003, a HAMAS suicide bomber detonated a bomb on Bus No. 37 in Haifa.  Seventeen (17) people were killed, including American Abigail Litle,[7] and fifty-three (53) others were wounded.

108.    On March 7, 2003, Americans Eli and Debra Horovitz[8] were eating Shabbat dinner when terrorists disguised as students infiltrated Kiryat Arba, Israel, shooting and killing them both.  HAMAS claimed responsibility for this attack.

109.    In the spring of 2003, the French newspaper Le Figaro reported that the public prosecutor's office in Paris had referred its concerns about CBSP to the Counter-Terrorist National Division based on another report by Tracfin.  The report did not mention the name of CBSP's bank.

---

[7] The Estate of Abigail Litle is a Plaintiff in *Wolf, et al. v. Credit Lyonnais, S.A.,* 07-cv-914-DLI-RML.

[8] The Estate of Debra Horowitz and the Estate of Eli Horowitz are Plaintiffs in *Wolf, et al. v. Credit Lyonnais, S.A.,* 07-cv-914-DLI-RML.

110.    On April 30, 2003, a HAMAS suicide bomber entered Mike's Place, a popular bar situated on the seashore a few hundred meters from the American Embassy in Tel Aviv, and detonated his bomb, killing three (3) people and injuring approximately sixty (60) people, including American Jack Baxter.[9]

111.    On June 11, 2003, a HAMAS suicide bomber dressed as a religious Jew boarded Egged Bus No. 14A in Jerusalem, Israel.  As the bus drove down Jaffa Road, he detonated his bomb, wrecking the bus and killing sixteen (16) of its passengers, including American Bertin Tita. Over one hundred (100) people were wounded, including Americans Ariela Friermark and Rivka Pam and dozens of bystanders.[10]

112.    On August 19, 2003, a HAMAS suicide bomber blew up Egged Bus No. 2, killing twenty-three (23) people, including Americans Mordechai Reinitz, Yissocher Dov Reinitz, Goldie Zarkowsky and Eli Zarkowsky, and injuring more than one hundred thirty (130) people, including Mendy Reinitz, Miriam Richter and Bshava Zarkowsky.[11]

113.    Thereafter, on August 22, 2003, pursuant to Executive Order 13224, President Bush identified CBSP as a HAMAS fundraising entity and placed it on the Office of Foreign Assets Control ("OFAC") list as an SDGT.

114.    The Statement of President Bush issued with that Executive Order reads as follows:

> At my direction, the Treasury Department has moved today to block and freeze the assets of six top HAMAS leaders and five non-governmental organizations that I am advised provide financial support to HAMAS.  By claiming responsibility for the despicable

---

[9] Jack Baxter is a Plaintiff in *Wolf, et al. v. Credit Lyonnais, S.A.,* 07-cv-914-DLI-RML.

[10] The Estate of Bertin Tita, Ariela Friermark, and Rivka Pam are Plaintiffs in *Wolf, et al. v. Credit Lyonnais, S.A.,* 07-cv-914-DLI-RML.

[11] The Estate of Mordechai Reinitz, the Estate of Yissocher Dov Reinitz, the Estate of Goldie Zarkowsky, the Estate Eli Zarkowsky, Mendy Reinitz, Miriam Richter and Bshava Zarkowsky are Plaintiffs in *Wolf, et al. v. Credit Lyonnais, S.A.,* 07-cv-914-DLI-RML.

act of terror on August 19, HAMAS has reaffirmed that it is a terrorist organization committed to violence against Israel and to undermining progress toward peace between Israel and the Palestinian people.

115.    The President thereby publicly linked the activities of CBSP and other fundraising organizations designated that day as SDGTs with the bombing that injured Plaintiffs.

116.    Pursuant to that designation, OFAC issued a "Blocking Notice," which froze all of CBSP's funds, accounts and real property.  All transactions involving property in which CBSP held any interest were prohibited, unless specifically authorized by OFAC.

117.    A month later, almost three years after Crédit Lyonnais had first reported "unusual activity" in CBSP's accounts, and 19 months after it decided to close the account, Crédit Lyonnais (allegedly) closed CBSP's accounts with the bank in September of 2003.

118.    During the relevant 33 months, HAMAS murdered and injured many Americans, including Rivka Pam and Nethaniel Bluth, whose family members are Plaintiffs in this action.

### 5.  **Credit Lyonnais' Material Support for HAMAS's Terrorist Activity**

119.    At all relevant times, Crédit Lyonnais maintained an account for CBSP in Paris and provided HAMAS with material support in the form of financial services.

120.    As Plaintiffs allege above, CBSP is a pivotal part of HAMAS's fundraising infrastructure and a significant source of HAMAS's financing.  At all relevant times, Crédit Lyonnais knew those facts.

121.    Crédit Lyonnais knowingly continued to maintain accounts for CBSP and provide financial services to HAMAS even though CBSP was outlawed by the Government of Israel in May 1997.

122.    Crédit Lyonnais also knowingly transferred significant sums of money to HAMAS-controlled entities both before and after their designation by the Government of Israel as unlawful.

123. Crédit Lyonnais transferred significant sums of money to HAMAS-controlled entities declared unlawful by the Government of Israel even after the United States Treasury Department designated CBSP a global terrorist in the wake of the August 19, 2003 bus bombing that killed 23 people and injured scores more, including some of the Plaintiffs in the *Wolf* action.

124. Crédit Lyonnais transferred funds on behalf of CBSP to HAMAS that were routed through the United States.

125. By knowingly providing valuable financial services to HAMAS, Crédit Lyonnais provided material support, within the definition set forth in 18 U.S.C. § 2339A(b), to a designated FTO, and provided substantial assistance to HAMAS in the commission of acts of international terrorism in Israel, including the terrorist attacks that injured Plaintiffs.

126. The provision of financial services to HAMAS violates the criminal provisions of 18 U.S.C. §§ 2339B and 2339C and gives rise to civil liability under 18 U.S.C. § 2333(a).

## CLAIMS FOR RELIEF

127. Plaintiffs' claims for relief herein conform to the operative claims for relief in *Wolf*, as set forth in the parties' joint pretrial order and in the *Wolf* plaintiffs' opposition to Crédit Lyonnais' motion for summary judgment. Plaintiffs assert claims for relief predicated on primary liability for Crédit Lyonnais' violation of 18 U.S.C. § 2339B and its aiding and abetting of HAMAS under 18 U.S.C. § 2333(d).

## FIRST CLAIM FOR RELIEF

## COMMITING ACTS OF INTERNATIONAL TERRORISM
## IN VIOLATION OF 18 U.S.C. §§ 2333(a)AND 2339B(a)(1)

128. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

129.    By knowingly providing financial services to HAMAS, Crédit Lyonnais has provided material support to an FTO designated under the AEDPA in violation of 18 U.S.C. § 2339B(a)(1).

130.    At all relevant times, Crédit Lyonnais knew of HAMAS's terrorist activities.

131.    Crédit Lyonnais also knew that HAMAS had been designated an FTO by the Government of the United States.

132.    At least as early as December 2000, Crédit Lyonnais knew the nature and identity of CBSP and of its direct connections to HAMAS.  Nonetheless, Crédit Lyonnais continued to provide financial services to HAMAS.

133.    Because Crédit Lyonnais knowingly providing material support to a designated FTO in violation of 18 U.S.C. § 2339A, Crédit Lyonnais is liable to Plaintiffs for damages in an amount to be determined at trial, treble damages, and the payment of the attorneys' fees and expenses incurred by Plaintiffs in connection with this action.

## SECOND CLAIM FOR RELIEF

### AIDING AND ABETTING FOREIGN TERRORIST ORGANIZATIONS IN VIOLATION OF 18 U.S.C. § 2333(d)

134.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

135.    Plaintiffs assert this cause of action under 18 U.S.C. § 2333(d) and the Justice Against Sponsors of Terrorism Act ("JASTA") § 2b.

136.    Plaintiffs are nationals of the United States.

137.    HAMAS was an FTO at the time it committed, planned, and authorized the terrorist attacks that injured Plaintiffs.

138.     Those terrorist attacks were acts of international terrorism, as defined by 18 U.S.C. § 2331.  The attacks: (a) involved violence and endangered human life; (b) would have violated federal and state criminal law, had they been committed in the United States; (c) appeared to be intended to intimidate or coerce the civilian populations of Israel and the United States, to influence the policies of the Israeli and American governments, and to affect the policies of those governments through violent action; and (d) occurred primarily outside the United States and transcended national boundaries in that HAMAS raised money internationally, intended to impact the citizens and governments of Israel and the United States, and operated internationally and sought asylum in multiple countries in the Middle East.

139.     Crédit Lyonnais knowingly provided substantial assistance to those acts of international terrorism.

140.     As Plaintiffs allege in detail above, Crédit Lyonnais provided substantial assistance to HAMAS by, among other conduct: (a) transferring significant sums of money to HAMAS and its front organization, CBSP; (b) maintaining bank accounts for CBSP; (c) providing HAMAS and CBSP with access to U.S. dollars and the international banking system; (d) providing seeming legitimacy to HAMAS's efforts to raise funds to finance its operations and to compensate terrorists and their family members following terrorist attacks; and (e) enabling HAMAS to convert funds nominally intended to support humanitarian causes into the resources necessary to commit terrorist attacks.

141.     Crédit Lyonnais' services and support provided encouragement to would-be terrorists and incentivized their future attacks.

142.     At the time Credit Lyonnais provided that substantial assistance to HAMAS, Crédit Lyonnais knew that: (a) HAMAS was a designated FTO; (b) HAMAS and its operatives engaged

in terrorism, including the attacks alleged herein; and (c) the financial assistance that Crédit Lyonnais was providing to HAMAS was essential to its ability to carry out terrorist attacks, including the attacks that injured Plaintiffs.

143.   Credit Lyonnais also knew that the substantial assistance that it provided to HAMAS would facilitate HAMAS's ability to carry out its terrorist attacks against Plaintiffs and other civilians.  As a result, Credit Lyonnais recognized that it played an integral role in HAMAS's terrorist activities.

144.   The substantial assistance that Credit Lyonnais provided to HAMAS was a substantial factor in causing Plaintiffs' injuries.  Moreover, Plaintiffs' injuries were a foreseeable result of that substantial assistance.

145.   As a direct and proximate result of the substantial, knowing assistance that Crédit Lyonnais provided to HAMAS, Plaintiffs have suffered significant physical, psychological and emotional injuries.

146.   Crédit Lyonnais is therefore liable to Plaintiffs for damages in an amount to be determined at trial, treble damages, and the payment of the attorneys' fees and expenses incurred by Plaintiffs in connection with this action.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

a.  Enter judgment against Crédit Lyonnais and in favor of each Plaintiff for compensatory damages in amounts to be determined at trial;

b.  Enter judgment against Crédit Lyonnais and in favor of each Plaintiff for treble damages in amounts to be determined at trial;

    c.   Enter judgment against Crédit Lyonnais and in favor of each Plaintiff for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333(a);

    d.   Enter an Order declaring that Crédit Lyonnais has violated, and is continuing to violate the Antiterrorism Act, 18 U.S.C. § 2331 *et seq.*; and

    e.   Grant such other and further relief as justice requires.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Dated: December 31, 2018
      New York, New York               Respectfully Submitted,

**STONE BONNER & ROCCO LLP**

By: /s/ James P. Bonner
James P. Bonner (jbonner@lawsbr.com)
Patrick L. Rocco (procco@lawsbr.com)
Susan M. Davies (sdavies@lawsbr.com)
1700 Broadway, 41st Fl.
New York, New York 10019
(212) 239-4460

**HEIDEMAN NUDELMAN & KALIK, PC**
Richard D. Heideman[*]
Noel J. Nudelman
Tracy Reichman Kalik[*]
1146 19th Street, NW, Fifth Floor
Washington, DC 20036
(202) 463-1818

**SAYLES WERBNER P.C.**
Mark S. Werbner[*]
4400 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270
(214) 939-8700

**PERLES LAW FIRM, P.C.**
Steven R. Perles[*]
Ed MacAllister[*]
1050 Connecticut Ave., NW, Fifth Suite 500
Washington, D.C. 20036
(202) 955-9055

**THE DAVID LAW FIRM, P.C.**
Jonathan David[*]
301 Congress Avenue, Suite 1910
Austin, Texas 78701-2959

**Attorneys for Plaintiffs**

---

[*]  Not admitted in E.D.N.Y.